Javon Thomas HENSON, Appellant,

v.

UNITED STATES, Appellee.

No. 10–CF–1177.

District of Columbia Court of Appeals.

Argued June 7, 2012.
Decided Nov. 15, 2012.

Lee R. Goebes, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

David B. Goodhand, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino and Katherine Rakoczy, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, Associate Judges, and KING, Senior Judge.

FISHER, Associate Judge:

Appellant Javon Henson challenges the denial of his motion to suppress a handgun and ammunition found on his person, claiming that they were discovered during

an unlawful seizure and frisk. Unpersuaded by his argument that an unsuccessful attempt by a police officer to detain an individual constitutes a seizure, we affirm.

## I. Factual Background

Shortly after midnight on January 31, 2010, two uniformed Metropolitan Police Department officers on routine patrol in a "high crime area" of northeast Washington pulled their marked vehicle alongside three young men who were walking in the neighborhood. Officer Matthew Jones explained to the men that they were "not in any trouble," but that the officers would like to "talk to [them] for a minute" about some recent robberies in the area. The officers then asked the men if they would agree to a pat-down for weapons. Two of the men replied that they had no objections, and Officer Sean Kenney began to frisk them.

The third man, appellant Javon Henson, also consented to a pat-down and placed his hands on the hood of the police car. Before Officer Jones could begin the frisk, however, appellant "put his hands down" and "started walking towards the back of [the] vehicle." Officer Jones asked, "hey, where are you going?" He also testified that "I may have placed my hand on the defendant's side as he was walking away. I don't recall." "[T]he next thing I know the defendant is attempting to run down the street." Officer Jones then "grabbed onto [appellant's] jacket," but appellant "was able to wiggle out of [it]."

The officers chased appellant for about twenty or thirty yards until appellant slipped and fell on the snow and the officers caught up with him. After a brief struggle during which appellant may have touched Officer Jones's gun, the officers placed Mr. Henson in handcuffs. Seeing that appellant's two companions were walking toward them and looked like they might pick up the jacket that appellant had dropped during the chase, Officer Kenney yelled at the men to stay back. He then frisked Mr. Henson, finding a pistol in his waistband. A subsequent search uncovered a bottle containing an alcoholic beverage. When Officer Jones asked why he had run, appellant "stated that he had an open bottle of liquor in his pocket."

The trial court denied Mr. Henson's motion to suppress the firearm. Crediting the officers' testimony, the court found that, as appellant was moving away from Officer Jones, and before appellant began his flight, Officer Jones "reached out and grabbed Mr. Henson's arm and said where are you going or words to that effect."[1] Appellant then "took off running." During the ensuing chase, appellant "essentially ran out of his coat." "After a short distance, [appellant] slipped on the ice and snow and fell to the ground," at which point the officers caught up with him and placed him in handcuffs. Based on these facts, the court concluded that Mr. Henson had not been seized until the officers caught up with him after he fell, by which point they had reasonable, articulable suspicion to conduct a *Terry* stop and a frisk. The court cited several factors that gave rise to reasonable suspicion in this case, including the late hour, the fact that the events took place in a high crime area,

---

1. Officer Jones testified that "I may have placed my hand on the defendant's side as he was walking away." Citing this testimony, the government argues that "the record does not support the [trial court's] finding that Officer Jones *ever* grabbed appellant's arm. Instead, Officer Jones grabbed appellant's jacket *after* appellant began his flight." We are not convinced that the court's finding was clearly erroneous. In any event, because we conclude in section II.D that appellant was not seized when Officer Jones "grabbed" his arm, a different finding by the trial court would not alter our legal conclusion.

appellant's "furtive gestures and movements" in "taking his hands off the police vehicle" and "moving away from the officer" after having consented to a pat-down, appellant's sudden flight, and the "fact that Mr. Henson's conduct and response was far different from the friends who were with him."

Following the court's denial of his motion to suppress, appellant agreed to a stipulated trial. The court found Mr. Henson guilty of carrying a pistol without a license,[2] being a felon in possession of a firearm,[3] possession of an unregistered firearm,[4] and unlawful possession of ammunition.[5] He now appeals the denial of his suppression motion.

## II. Analysis

### A. Standard of Review

■■■ "Our review of a trial court's denial of a motion to suppress is limited." *Jones v. United States*, 972 A.2d 821, 824 (D.C.2009). "We 'take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Hampleton v. United States*, 10 A.3d 137, 142 (D.C.2010) (quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). Moreover, "[w]e view the evidence presented at the suppression hearing in the light most favorable to the party prevailing below, and we draw all reasonable inferences in that party's favor." *Womack v. United States*, 673 A.2d 603, 607 (D.C.1996) (citing *Peay v. United States*, 597 A.2d 1318, 1320 (D.C. 1991) (en banc)). "However, legal conclusions on Fourth Amendment issues, including whether a seizure has occurred and, if

so, whether it was justified by reasonable articulable suspicion, are legal questions that we review *de novo*." *Bennett v. United States*, 26 A.3d 745, 751 (D.C.2011) (citing *Jacobs v. United States*, 981 A.2d 579, 582 (D.C.2009)).

### B. When Does a Seizure Occur?

■■■ Where a *Terry* stop is challenged as improper, "the threshold question is whether and when a seizure occurred." *Plummer v. United States*, 983 A.2d 323, 331 (D.C.2009) (internal editing omitted). "Street encounters between citizens and police officers are incredibly rich in diversity," *Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and not every interaction between a police officer and a citizen constitutes a seizure. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, *terminates or restrains his freedom of movement . . . .*" *Plummer*, 983 A.2d at 331 (emphasis added) (quoting *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007)); *see also Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868 ("Only when the officer, by means of physical force or show of authority, has in some way *restrained the liberty* of a citizen may we conclude that a 'seizure' has occurred.") (emphasis added).

Appellant does not dispute that his initial encounter with Officers Kenney and Jones was consensual. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). However, he claims that he

---

2. D.C.Code § 22–4504(a) (2001).

3. D.C.Code § 22–4503(a)(2) (2001).

4. D.C.Code § 7–2502.01 (2008).

5. D.C.Code § 7–2506.01 (2008).

was seized when Officer Jones "grabbed [his] arm" and asked "where are you going?", even though he failed to stop and, indeed, broke into full flight. We disagree.

## C. An Unsuccessful Attempt to Detain a Suspect Is Not a Seizure

The Supreme Court has addressed the application of the Fourth Amendment to suspects who refuse to submit to police authority in two key cases: *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), and *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In *Brower*, the suspect "was killed when the stolen car that he had been driving ... crashed into a police roadblock" set up to stop him after he had eluded pursuing police for approximately twenty miles. 489 U.S. at 594, 109 S.Ct. 1378. Emphasizing that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," *id.* at 596, 109 S.Ct. 1378 the Court held that Brower had been seized when he was "stopped by the very instrumentality ... put in place in order to achieve that result," *id.* at 599, 109 S.Ct. 1378. The Court "did not even consider the possibility that a seizure could have occurred during the course of the chase because ... that 'show of authority' did not produce his stop." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547 (discussing *Brower*).

In *Hodari D.*, the defendant and his companions fled when they saw two police officers approaching in a vehicle. *Id.* at 622–23, 111 S.Ct. 1547. The officers gave chase and tackled the suspect a few blocks later, after he had discarded the crack cocaine he had been carrying. *Id.* at 623, 111 S.Ct. 1547. Describing the "narrow question" before the court as "whether, with respect to a show of authority ..., a seizure occurs even though the subject does not yield," the court held "that it does not." *Id.* at 626, 111 S.Ct. 1547.

*Brower* and *Hodari D.* both dealt with suspects who refused to submit to an officer's "show of authority." The Supreme Court has yet to consider directly whether the same analysis applies to cases in which a police officer unsuccessfully attempts to detain an individual by force. There is language in *Hodari D.* which might suggest that a seizure occurs whenever an officer applies force, even though he does not succeed in stopping the suspect. *See* 499 U.S. at 626, 111 S.Ct. 1547 ("The narrow question before us is whether, with respect to a show of authority *as with respect to application of physical force*, a seizure occurs even though the subject does not yield. We hold that it does not.") (emphasis added).[6] But, as other courts have pointed out, *see, e.g., Brooks v. Gaenzle*, 614 F.3d 1213, 1220–21 (10th Cir.2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 1045, 178 L.Ed.2d 864 (2011), much of this language in *Hodari* is about the historical, common law definition of seizure and therefore is not dispositive of the constitutional question of when an individual is seized for purposes of the Fourth Amendment. *See Hodari D.*, 499 U.S. at 626 n. 2, 111 S.Ct. 1547 ("[N]either usage nor common-law tradition makes an *attempted* seizure a seizure. The common law may have made an attempted seizure unlawful in certain circumstances; but it made

---

6. *See also, e.g., id.* ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."); *id.* at 624, 111 S.Ct. 1547 ("To constitute an arrest, however—the quin-

tessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient.").

many things unlawful, very few of which were elevated to constitutional proscriptions.").

Whatever the common law meanings of "seizure" and "arrest," the Supreme Court has not suggested, much less held, that a suspect is seized or under arrest for Fourth Amendment purposes even when he is engaged in headlong flight. "To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity." *Id.* at 625, 111 S.Ct. 1547. The Court explained: "If, for example, [Officer] Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest." *Id.* More recently, the Court has reiterated that "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, *terminates or restrains his freedom of movement* through means intentionally applied...." *Brendlin,* 551 U.S. at 254, 127 S.Ct. 2400 (internal quotation marks and citations omitted; emphasis added); *see also County of Sacramento v. Lewis,* 523 U.S. 833, 845 n. 7, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment.").

Thus, several courts have held that the critical question in determining whether a seizure occurred for purposes of the Fourth Amendment in both show of authority and physical force cases is whether the police officer actually succeeded in restraining the individual. *See, e.g., Brooks v. Gaenzle,* 614 F.3d at 1220, 1221–22 ("[N]one of our holdings suggest the mere

use of physical force or show of authority alone, without termination of movement or submission, constitutes a seizure."; no seizure occurred when police shot at and hit defendant who "continued to flee and elude authorities for days"); *United States v. Bradley,* 196 F.3d 762, 768 (7th Cir.1999) (to constitute a seizure, "the show of authority or use of force must have caused the fleeing individual to stop attempting to escape"); *United States v. Hernandez,* 27 F.3d 1403, 1407 (9th Cir.1994) ("A seizure does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective."). *But see United States v. Brown,* 448 F.3d 239, 245 (3d Cir.2006) ("[W]hen a seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that force." (quoting *Hodari D.,* 499 U.S. at 625, 111 S.Ct. 1547)); *Ludwig v. Anderson,* 54 F.3d 465, 471 (8th Cir. 1995) ("[A] seizure occurs when *either* the citizen submits to an assertion of authority *or* physical force is applied, regardless of whether the citizen yields to that force."; however, "that seizure does not continue during 'period[s] of fugitivity'") (citation omitted).

We conclude that there is little justification for assigning constitutional relevance to whether an officer attempts to detain an individual by a show of authority or through an unsuccessful application of physical force. In both situations, there are substantial and legitimate concerns that fleeing suspects place in danger the officers who pursue them and the general public. *See Hodari D.,* 499 U.S. at 627, 111 S.Ct. 1547 ("Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged."); *United States v. Hernandez,* 27 F.3d at 1407 (noting that a rule that treats a suspect's momentary hesitation before flight as submission "would encourage suspects to flee after the

slightest contact with an officer in order to discard evidence, and yet still maintain Fourth Amendment protections"). Furthermore, "an individual wronged by an unlawful search or arrest has recourse through legal means, such as the exclusionary rule or civil claims for constitutional rights violations...." *Id.* There is no need for an individual to resort to flight to protect his or her rights. *See id.*[7]

■ Like the defendant in *Hodari D.*, appellant argues that the proper test for determining whether he was seized is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *See* 499 U.S. at 627–28, 111 S.Ct. 1547. Yet, as the Supreme Court concluded there, this test "states a *necessary*, but not a *sufficient*, condition for seizure...." *Id.* at 628, 111 S.Ct. 1547. The Court went on to explain that it had "not even consider[ed in *Brower*] the possibility that a seizure could have occurred during the course of the chase because ... that 'show of authority' *did not produce his stop.*" *Id.* (emphasis added).

We have, of course, often invoked appellant's formulation of the test in holding that an officer's application of physical force constituted a seizure. In each of these cases, however, the use of force succeeded in stopping the defendant. *See, e.g., Griffin v. United States*, 878 A.2d 1195, 1198 (D.C.2005) (defendant was seized when an officer "grabbed [him] by the scruff of [his] neck [that is, by his

shirt] ... and brought [him] out of the hotel," and then questioned him while two officers held his arms); *Duhart v. United States*, 589 A.2d 895, 898 (D.C.1991) ("[O]nce the officer grabbed appellant's wrist, appellant was seized...."); *Curtis v. United States*, 349 A.2d 469, 471 (D.C. 1975) ("[T]here can be no question but that Officer Pope seized appellant when he physically took hold of him in order to conduct a frisk."). Application of this objective test was therefore necessary to ascertain whether the individual had cooperated with the police "in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer's investigation." *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (emphasis omitted) (quoting *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)).

### D. Appellant Was Not Seized Until After He Fell

■ In this case, appellant was not seized when Officer Jones "grabbed [his] arm" and asked him "where are you going?" because his "freedom of movement" was not "terminated." *See Brendlin*, 551 U.S. at 254, 127 S.Ct. 2400. To the contrary, appellant "took off running" in an attempt to elude the authorities. Officer Jones then "grabbed onto [appellant's] jacket," but he "was able to wiggle out of [it]." The officers did not acquire "physical control" over appellant until twenty or thirty yards later, when they grabbed him

---

7. Similar concerns are embodied in D.C.Code § 22–405(b) (2012 Supp.), which prohibits any individual from assaulting, resisting or interfering with a police officer who is engaged in the performance of his official duties. By prohibiting resistance even when an officer's conduct is unlawful, the statute "deescalate[s] the potential for violence which exists whenever a police officer encounters an individual in the line of duty." *Dolson v. United States*, 948 A.2d 1193, 1202 (D.C.2008) (quoting *In re C.L.D.*, 739 A.2d 353, 355 (D.C. 1999)).

after he fell, and therefore he was not seized until that time. *See Brower,* 489 U.S. at 596, 109 S.Ct. 1378.[8] It is thus constitutionally irrelevant that the police did not have reasonable, articulable suspicion to justify a seizure at an earlier time.

### E. The Officers Had Reasonable, Articulable Suspicion

■ "The Fourth Amendment permits a police officer to stop an individual for investigatory purposes so long as the officer possesses a reasonable suspicion supported by 'specific and articulable facts' that the individual is involved in criminal activity." *Milline v. United States,* 856 A.2d 616, 619 (D.C.2004) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868). An officer may also conduct a protective frisk for weapons if he or she has reasonable, articulable suspicion that the person detained is armed and dangerous. *Germany v. United States,* 984 A.2d 1217, 1222 (D.C.2009).

■ The reasonable suspicion standard is not onerous; it requires "substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence." *Umanzor v. United States,* 803 A.2d 983, 992 (D.C.2002) (quoting *In re T.L.L.,* 729 A.2d 334, 339 (D.C.1999)). In determining whether this standard has been met, a court must consider the totality of the circumstances, *Peay v. United States,* 597

A.2d 1318, 1320 (D.C.1991) (en banc) (quoting *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)), as viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training...." *Johnson v. United States,* 33 A.3d 361, 370 (D.C.2011) (quoting *Singleton v. United States,* 998 A.2d 295, 300 (D.C.2010)).

■ The trial court found that several factors created reasonable suspicion to seize appellant.[9] We focus on four: (1) appellant's unprovoked flight from the officers, (2) at night, (3) in a high crime area, (4) after the officers indicated that they were interested in investigating recent robberies in the area and that they wanted to know if appellant had any weapons on him.

In *Illinois v. Wardlow,* an individual "fled upon seeing police officers patrolling an area known for heavy narcotics trafficking." 528 U.S. 119, 121, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). After the officers caught up with him, they frisked him and discovered a handgun. *Id.* Turning first to the high crime area in which the flight had occurred, the Court observed that although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[,] ... officers are not required to ignore the relevant

---

8. Appellant also contends that his "brief and unsuccessful attempt to flee ... [did] not terminate [his initial] seizure." Because we hold that Officer Jones's unsuccessful attempt to detain appellant did not constitute a seizure, we need not address this issue. *But see State v. Lisenbee,* 116 Nev. 1124, 13 P.3d 947, 951 (2000) ("[F]light after a seizure occurs is an effectual end to that seizure.").

9. Among the factors cited by the court was the "fact that Mr. Henson's conduct and response was far different from the friends who were with him." While varying levels of co-

operation with the police clearly cannot give rise to an inference of wrongdoing, *see Duhart,* 589 A.2d at 900–01 ("A refusal to listen, answer, or cooperate with the police does not furnish grounds for an investigatory stop." (citing *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion))), in context, the trial court was relying on a permissible consideration. As the court explained, "Mr. Henson fled suddenly from the officers when, in fact, his friends who he was with did not."

characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* at 124, 120 S.Ct. 673 (citation omitted). The Court then noted that "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." *Id.* "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* Based on these two factors alone, the Court concluded that the officers had reasonable suspicion to stop the suspect. *Id.* at 125, 120 S.Ct. 673.

▮ Here, there are more factors supporting reasonable suspicion than there were in *Wardlow*. Officer Kenney testified that appellant was walking late at night in "one of the higher crime areas" in the police district, one in which there had been numerous weapons-related offenses. *See Singleton,* 998 A.2d at 300 ("Various factors are considered in determining whether a *Terry* stop is justified, including 'the time of day, flight, the high crime nature of the location ....'" (quoting *Jackson v. United States,* 805 A.2d 979, 989 (D.C.2002))). Appellant knew that the officers were interested in investigating recent robberies in the area, and that they wanted to know if he had any weapons on him. And, in the midst of this encounter with the police, appellant took off running. These factors justified Officer Jones "in suspecting that [appellant] was involved in criminal activity, and, therefore, in investigating further." *See Wardlow,* 528 U.S. at 125.

▮ Appellant insists that his flight should not be given much, if any, weight because he was merely "exercis[ing] his right to withdraw his consent" to the patdown, and such withdrawal does "not itself raise a suspicion of criminal activity." It is certainly true that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673. Such a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Id.* (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382). In addition, a suspect has a right to revoke consent to a search prior to its completion, although this withdrawal must be "unequivocal." *Burton v. United States,* 657 A.2d 741, 748 (D.C.1994) ("[A]n effective withdrawal of consent requires unequivocal conduct, in the form of either an act, statement, or some combination of the two, that is inconsistent with the consent to the search previously given."). For these reasons, our analysis might be different if appellant had vocally announced that he was withdrawing his consent or if he had merely continued to walk away, without breaking into a run. But "[f]light, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put" and refuse any further cooperation. *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673. The officers were therefore justified in concluding that appellant's flight indicated a "consciousness of guilt." *See United States v. Johnson,* 496 A.2d 592, 597 (D.C.1985) ("[F]light from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry* seizure.").

Appellant nevertheless argues that, unlike in *Wardlow,* his flight was provoked by the police. Emphasizing that he initially attempted to walk away from the offi-

cers, appellant argues that he "did not run due to the mere presence of the police, but only when Officer Jones provoked the flight" by grabbing him. *See Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (defendant's "*unprovoked* flight" provided officers with reasonable suspicion to stop him) (emphasis added). In other words, appellant claims that his flight was "natural and innocent" rather than suspicious. *See Smith v. United States*, 558 A.2d 312, 316 (D.C.1989) (en banc) ("To provide grounds for suspicion, ... the circumstances of the suspect's efforts to avoid the police must be such as permit a rational conclusion that flight indicated a consciousness of guilt." (internal editing omitted) (quoting *In re D.J.*, 532 A.2d 138, 141 (D.C.1987))).

■ We are not convinced by appellant's claim that his flight was "provoked." No doubt there are circumstances in which an individual would be justified in fleeing from the police and no inference of a guilty conscience could be drawn from that flight. For example, if an officer uses excessive force in carrying out his duties, an individual may act in self-defense, which may include an attempt to get away from the officer. *See Nelson v. United States*, 580 A.2d 114, 117 (D.C.1990) (noting that an individual may use "self-defense against a police officer who is using excessive force in carrying out official duties"); D.C.Code § 22–405(b) (2011 Supp.). Similarly, if a person flees from "masked men with guns" who are not identifiable as police officers, the most logical inference may be that the individual was trying to protect himself, not that he was engaged in wrongdoing. *See Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 771 (7th Cir.2002) ("Marshall did what any sane person would do if he saw masked men with guns running toward him: he ran like hell. And he ran right to

uniformed police officers for protection! He wasn't trying to get away from the 'police'—he was trying to get to the 'police' as fast as he could."); *cf. Wong Sun v. United States*, 371 U.S. 471, 482–83, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (concluding that suspect's flight did not support "an inference of guilty knowledge" because officer had "affirmatively misrepresented his mission ... [and] never adequately dispelled the misimpression engendered by his own ruse"; "[W]hen an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight from the door must be regarded as ambiguous conduct.").

Without attempting to provide an exhaustive list of circumstances in which an individual's flight from the police might fail to raise an inference of a guilty conscience, we conclude that appellant's flight does not fall within this class. There is no question that appellant knew he was dealing with police officers. Nor was there any allegation that Officer Jones used excessive force when he reached out and grabbed appellant's arm. Most importantly, as already discussed, we cannot condone or encourage flight from an officer every time an individual believes that the officer's conduct is unlawful. *See Hodari D.*, 499 U.S. at 627, 111 S.Ct. 1547. If appellant believed that Officer Jones' conduct was illegal, he should have tested its legality through the courts, rather than engage in self-help. *See id.* ("[S]ince the addressee has no ready means of identifying the deficient [police orders] it almost invariably is the responsible course to comply."); *United States v. Garcia*, 516 F.2d 318, 320 (9th Cir.1975) (concluding that even if defendant "fled in exercise of his common law right to resist ... an unlawful stop," the court would not "immunize [this] suspicious conduct from consideration in deter-

mining whether" probable cause existed).[10]

■ Finally, we conclude that the police had reasonable, articulable suspicion justifying the frisk of appellant. This encounter occurred late at night in a high crime area known specifically for weapons. When appellant fled without legal provocation, after the officers expressed a desire to determine whether he had any weapons, it was not unreasonable to infer that he might be concerned that the pat-down would reveal that he was indeed carrying a weapon. Moreover, the officers were outnumbered by appellant and his two companions, who were "advancing on [the officers'] position" and looked like they were going to pick up appellant's jacket, which might contain a weapon. *See United States v. White*, 593 F.3d 1199, 1203 (11th Cir.2010) (fact that law enforcement officers were outnumbered was a factor supporting pat-down); *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir.2003) (same). In these circumstances, we conclude that "a reasonable and cautious police officer" would have been concerned for his safety. *See Johnson*, 33 A.3d at 370 (quoting *Singleton*, 998 A.2d at 300).

### III. Conclusion

Consistent with *Brower* and *Hodari D.*, we hold that an individual is seized within the meaning of the Fourth Amendment only when he or she is within the officer's control or yields to the officer's show of authority or application of force. Thus, appellant was not seized when Officer Jones "grabbed his arm" but appellant continued to flee. Appellant was seized only when Officer Jones gained physical control of him after he fell, by which point

10. Appellant also claims that his flight from the police should not be included in the reasonable suspicion analysis because it was the "fruit" of an illegal seizure. *See Wong Sun*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441

there was reasonable, articulable suspicion for the seizure and subsequent frisk. The decision of the Superior Court is

*Affirmed.*

BLACKBURNE–RIGSBY, Associate Judge, concurring:

While I join the majority opinion affirming appellant's convictions, in my view, this particular factual scenario presents ambiguous Fourth Amendment questions. Here, appellant initially consented to a pat-down, even though he was specifically told by the officers that he was not suspected of any illegal activity. Subsequently, appellant decided to walk away prior to the pat-down but began to run after being grabbed by one of the officers. The officers then gave chase, stopped him, and discovered a weapon on him, which ultimately led to appellant's arrest. Although I am troubled by this factual scenario, the majority's interpretation of *Brower v. Cnty. of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), and *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), suggesting that a seizure is not effectuated until the individual yields to police power, is not unreasonable. Thus, I concur with my colleagues that appellant was not seized when the officer initially grabbed his arm, but rather he was seized only when he fully yielded to police authority. *See Hodari D., supra*, 499 U.S. at 625, 111 S.Ct. 1547.

Concurring with the majority's seizure argument, I focus my attention on whether the officers here had reasonable, articulable suspicion that appellant was engaged in criminal activity necessary to justify the seizure. The majority's strict interpreta-

(evidence discovered as a result of unlawful police action must generally be suppressed). Because we conclude that appellant was not seized until after he fled from the officers, we do not consider this argument.

tion of *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), is somewhat troubling to me and I write separately to address my concerns.

In *Wardlow,* the Supreme Court concluded that the police officers had reasonable, articulable suspicion that the defendant was engaged in criminal activity because of his unprovoked flight, in an area known for heavy narcotics trafficking, immediately upon noticing the oncoming police officers. *See Wardlow, supra,* 528 U.S. at 124, 120 S.Ct. 673. The Court stated, in justifying the defendant's seizure, "[t]he officer[s] must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Id.* at 123–24, 120 S.Ct. 673 (quoting *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted). Thus, in *Wardlow,* the Court determined that the officers had sufficient reasonable, articulable suspicion to justify the defendant's seizure based on the facts that the officers were actively canvassing an area of Chicago known for drug-dealing and the defendant was holding an "opaque bag" when he fled—unprovoked—after noticing the oncoming officers. *Id.* at 122–25, 120 S.Ct. 673.

We have since adopted *Wardlow* and its dual factors—unprovoked flight and "high crime area"—into our case law, as a means of establishing reasonable, articulable suspicion to justify the lawful seizure of some suspects. *See generally Howard v. United States,* 929 A.2d 839, 845–46 (D.C.2007) (concluding that the defendant's actions of flagging down cars in a high-drug area and

quickly walking away from an officer constituted reasonable, articulable suspicion); *Wilson v. United States,* 802 A.2d 367, 371 (D.C.2002) (concluding that the defendant's actions in evading police officers in a high crime area were sufficient for an officer to have reasonable, articulable suspicion). I write separately to express my concern that the *Wardlow* dual factors should not be applied so formulaically that they become a substitute for requiring police officers to have *particularized* suspicion of an individual's suspected criminal activity prior to a lawful seizure. *See Singleton v. United States,* 998 A.2d 295, 300–01 (D.C. 2010) ("[T]o be 'reasonable' the suspicion must be based on facts that would have led another officer to have a similar suspicion. Moreover, to be 'articulable,' there must be *specific evidence*—not merely conclusions—that led the officer to suspect criminal activity in a *particular circumstance.*" (emphasis added)). I caution against the application of *Wardlow* to establish the formula that flight plus an alleged high crime area is equivalent to reasonable, articulable suspicion that a specific individual engaged in criminal activity. Instead, I think the Fourth Amendment necessitates a more exacting legal standard, requiring particularized findings.

Given our case law adopting *Wardlow,* in the present case I accept, with some unease, that the officers here had reasonable, articulable suspicion to justify appellant's seizure. The majority opinion upholds the trial court's findings that the officers had reasonable, articulable suspicion, based primarily on appellant's unprovoked flight in a so-called high crime area.[1]

---

1. Because of our deferential standard of review regarding the trial court's factual findings, I am constrained to defer to the trial court's finding that appellant's flight was unprovoked. *See Joseph v. United States,* 926 A.2d 1156, 1160 (D.C.2007) ("We must **defer**

to the [trial] **courts findings** of evidentiary **fact** and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling below."). Furthermore, the record is not entirely clear what factors led to the trial court's finding

Although the majority opinion notes that the fact that the seizure occurred late at night supports the conclusion that the officers had reasonable, articulable suspicion, this is a general factor that does not specifically implicate appellant in any wrongdoing, nor does it indicate how appellant's *own* actions were suspicious to the officers. The remaining factors that the majority relies upon in supporting reasonable, articulable suspicion are that appellant knew that the officers were investigating recent robberies and that they were concerned about whether he was armed, and that, "in the midst of this encounter with the police, appellant took off running." While appellant's behavior could suggest that appellant withdrew his consent to the pat-down, I agree that it also seems likely that his behavior suggested to the officers that appellant possessed a weapon.

As Justice Stevens emphasized in *Wardlow*, "[a]mong some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." *Wardlow, supra,* 528 U.S. at 132, 120 S.Ct. 673 (Stevens, J. concurring in part, dissenting in part). These concerns

have particular resonance in the District of Columbia and other urban areas where an overly strict and formulaic application of *Wardlow* and its progeny could lead to unequal protection of citizens' Fourth Amendment rights, depending upon where a person lives or frequents, and the justification of seizures that are unsupported by any actual, particularized suspicions of wrongdoings by that person. A more nuanced interpretation of *Wardlow* necessitates not only a finding of the *Wardlow* dual factors of flight and a high crime area but also *specific* and *articulable* facts that a particular individual is *suspected* of being involved in criminal activity. *See United States v. Bennett,* 514 A.2d 414, 415–16 (D.C.1986) (requiring the government to present a "particularized and objective basis for suspecting [a defendant] of criminal activity").[2] Here, I concur because the majority opinion addressed not only the two dual factors of unprovoked flight and high crime area, but also considered the additional factors that appellant was aware that the officers were investigating robberies, and that they wanted to know if appellant had weapons on him and that he fled in the midst of his encounter with the police. Had appellant simply walked away when the officers first approached him, without demonstrating other suspicious conduct, that scenario might compel rever-

that this was a high crime neighborhood, other than the government's proffer. *See* Andrew G. Ferguson & Damien Bernache, *The "High–Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis,* 57 Am. U.L.Rev. 1587, 1619–20 (2008) (arguing that the use of the term "high-crime area" is not well-defined and may be over-inclusive.)

2. For example, in *Bennett, supra,* a case decided before *Wardlow,* the court concluded that there was reasonable, articulable suspicion justifying defendant's seizure based on the government proffer that: (1) the defen-

dant was fleeing in a high narcotics area where the officers had been specifically detailed to intercept the trafficking of PCP; (2) the officers saw four men standing in an alley and saw one of them accepting money from another; (3) the officers saw the defendant stick his hand into his waistband; (4) the officers knew that drug traffickers often worked in pairs; (5) before the officers exited their vehicles, the suspects began to run; (6) the suspects ran in opposite directions, a known tactic for criminals working in pairs; and (7) the officers noticed that the defendant kept his hand within his waistband while he was running. 514 A.2d at 415–16.

sal.[3] Accordingly, I would simply stress that the totality of these factors, and not merely the evidence of flight in a high crime area, form the basis of our affirmance of the trial court's finding that when the officers seized appellant, they had reasonable, articulable suspicion that appellant was unlawfully armed.

3. I am also troubled by the fact that the appellant's arguable attempt to exercise his right to withdraw consent to the pat-down became a "factor" relied upon in establishing that the officers had reasonable, articulable suspicion that appellant committed a crime.