*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CF-0073

MAURICE RONNIE MITCHELL, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2018-CF2-013398)

(Hon. Michael K. O'Keefe, Trial Judge)

(Argued October 31, 2023                              Decided May 9, 2024)

*Paul Maneri*, with whom *Samia Fam* and *Shilpa S. Satoskar* Public Defender Service, were on the brief for Appellant.

*Valerie Tsesarenko*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, *Brandon Regan*, and *Kristian Hinson*, Assistant United States Attorneys, were on the brief for Appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and HOWARD and SHANKER,[*] *Associate Judges*.

---

[*]Associate Judge AliKhan was originally assigned to this case. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Judge Shanker has been assigned to take her place on the panel.

HOWARD, *Associate Judge*: On the evening of September 10, 2018, Metropolitan Police Department ("MPD") officers received a ShotSpotter alert indicating a possible shot fired near their location. A few minutes after the alert, the officers encountered Appellant Maurice Mitchell riding a bicycle away from the general location of the potential gunshot. The officers testified that when Mr. Mitchell noticed the officers' car pull to the intersection where he was biking, he flinched and increased his speed away from the officers. After following him for a short while, the officers activated their emergency lights, stopped Mr. Mitchell, and yelled for him to show them his hands. After approaching Mr. Mitchell to secure his hands, the officers observed the end of a firearm protruding out of an open bag on the handlebar of the bicycle.

Following a stipulated trial, Mr. Mitchell was convicted of unlawful possession of a firearm (prior conviction),[1] carrying a rifle or shotgun,[2] possession of unregistered firearm,[3] unlawful possession of ammunition,[4] and wearing a hood or mask while engaged in unlawful conduct.[5] On appeal, Mr. Mitchell challenges

---

[1] In violation of D.C. Code § 22-4503(a)(1).

[2] In violation of D.C. Code § 22-4504(a-1)(a)(2).

[3] In violation of D.C. Code § 7-2502.01(a).

[4] In violation of D.C. Code § 7-2506.01(3).

[5] In violation of D.C. Code § 22-3312.03.

the trial court's denial of his motion to suppress, arguing that the officers' discovery of the firearm was the fruit of an unlawful stop because the officers lacked a particularized and articulable suspicion to conduct the stop. We agree. Accordingly, we reverse the trial court's denial of the motion to suppress physical evidence.

## I. Background

On September 10, 2018, MPD Officers Karina Phillip and Willmino Pantaleon were inside their marked patrol car in an alley near the 2400 block of 4th Street Northeast when the ShotSpotter app[6] on Officer Phillip's MPD phone alerted. The ShotSpotter app indicated that a single shot had possibly been fired at 2316 4th Street Northeast. Though the officers were located "[a]bout a block or a block and a half away," neither officer heard a gunshot. Within a minute of receiving the app alert, MPD's Command Information Center confirmed the ShotSpotter had detected a single gunshot and requested that officers in the vicinity canvass the area. There were no accompanying 911 calls related to the possible gunshot and no reports of a suspect or any suspect's direction of travel. Officers Phillip and Pantaleon decided

---

[6] As the trial court explained, ShotSpotter technology "detects the sound of possible gunshots, and pinpoints the location of the gunshots on a map," and the app alerts officers.

to go toward the location identified by the ShotSpotter alert and began "to slowly cruise out from the alleyway" toward 4th Street.

When the officers reached the end of the alley at the intersection of 4th Street, they observed Mr. Mitchell on a bicycle traveling away from the direction that the ShotSpotter indicated the gunshot had originated. Officer Phillip testified that as their patrol car began to exit the alley, they "saw the bike coming, [and they] didn't want it to collide" so they "ha[d] to wait." She went on to testify that she did not see anyone else before reaching the mouth of the alley where she saw and focused on Mr. Mitchell riding his bicycle. The officers stopped their patrol car to allow Mr. Mitchell to pass. As he rode past them, the officers observed that Mr. Mitchell was wearing all black with a hood covering his head and a facemask that covered the perimeter of his face.[7] At some point earlier that evening, it had rained, but it was not raining when the officers encountered Mr. Mitchell.

---

[7] Officer Pantaleon explained that the mask only covered the perimeter of Mr. Mitchell's face and clarified that it was not a mask with just the eyes cut out; thus, the mask did not cover or obscure his facial features. Officer Phillip agreed that the mask did not cover Mr. Mitchell's face. When the officers detained Mr. Mitchell, he had a blue plastic glove on one hand. However, Officer Phillip could not recall whether she observed the plastic glove on one of Mr. Mitchell's hands before or after they stopped him.

Describing the events after the officers had to stop the patrol car to avoid colliding with Mr. Mitchell, Officer Phillip explained that Mr. Mitchell was initially biking "at a normal speed, but as he saw [their] cruiser . . . . [H]e began peddling [sic] like a lot faster and then he [kept] looking back." Officer Pantaleon further testified that when Mr. Mitchell saw the officers "he flinched," and Officer Phillip stated that Mr. Mitchell looked "a bit nervous." After making these observations, the officers made a right onto 4th Street—away from the location that they were to canvass—intending to follow and "make contact with [Mr. Mitchell]." Officer Pantaleon testified that after he made the right, Mr. Mitchell was approaching Channing Street and turned up a ramp to the Edgewood Apartments. The officers made a U-turn to follow Mr. Mitchell up the ramp.

When the officers reached the top of the ramp, Mr. Mitchell was straddling his bicycle while attempting to enter the front door of the apartment. Officer Phillip testified that other people were outside around the apartment complex at that time. The officers activated the emergency lights on their patrol car, exited their patrol car, and walked toward Mr. Mitchell. Officer Phillip approached with her hand on her gun, as both the officers shouted, "Let me see your hands." Mr. Mitchell turned to look at the approaching officers, and raised his left hand toward the officers while keeping his right hand on the handlebar. Officer Pantaleon described Mr. Mitchell's posture as "blading his body away from me, like as if he's hiding something."

The officers closed in on Mr. Mitchell and each officer secured one of his arms. At that time, the officers could see a partially open black bag hanging on the handlebar, and Officer Pantaleon saw "[t]he back piece and trigger guard" of a firearm sticking out of the bag. The officers immediately placed Mr. Mitchell under arrest. While Officers Phillip and Pantaleon pursued Mr. Mitchell, another MPD officer responded to the location of the ShotSpotter Alert and found other people in the area and "no apparent emergency."

Mr. Mitchell filed a motion to suppress the firearm recovered during the stop. Following an evidentiary hearing, in which Officers Phillip and Pantaleon testified, the trial judge denied Mr. Mitchell's motion. In ruling on the motion to suppress, the trial court explained that the officers had reasonable suspicion because of the "geographic and temporal proximity between the ShotSpotter alert and the officers' first encounter with [Mr. Mitchell]" combined with his "[e]vasive behavior in response to police presence" and the "lateness of the hour."

Shortly thereafter, Mr. Mitchell agreed to a stipulated bench trial, reserving his right to appeal the trial court's ruling on his earlier motion to suppress. Mr. Mitchell was convicted and sentenced to eighteen months incarceration, suspended as to all but twelve months; three years of supervised release, all suspended; and 1 year of supervised probation. Mr. Mitchell was later released

pending appeal pursuant to his request under D.C. Code § 23-1325(c), after this court determined, on an emergency motion, that his request was improperly denied because his suppression motion raised a "substantial question of law" and remanded. *Mitchell v. United States*, 234 A.3d 1203, 1211 & n.13 (D.C. 2020) (noting trial court "promptly" released Mr. Mitchell after our remand in that case).

## II. Standard of Review

When reviewing a trial court's denial of a motion to suppress, this court "must defer to the [trial] court's findings of evidentiary fact and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling below." *Jackson v. United States*, 157 A.3d 1259, 1264 (D.C. 2017) (quoting *Joseph v. United States*, 926 A.2d 1156, 1160 (D.C. 2007)). However, "[w]hether officers had reasonable suspicion to justify a stop is a question of law that we review de novo." *Posey v. United States*, 201 A.3d 1198, 1201 (D.C. 2019) (citing *Miles v. United States*, 181 A.3d 633, 637 (D.C. 2018)). The government bears the burden of demonstrating that at the time Mr. Mitchell was stopped MPD officers had reasonable and articulable suspicion to justify the stop. *United States v. Jones*, 1 F.4th 50, 52 (D.C. Cir. 2021).

### III.    Discussion

"It is well-established . . . that, consistent with the Fourth Amendment, an officer may conduct a brief stop (a seizure) 'for investigatory purposes' when he has 'reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity[.]'" *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016) (brackets in original) (quoting *Robinson v. United States*, 76 A.3d 329, 335-36 (D.C. 2013)).  Reasonable suspicion is not a particularly arduous standard; certainly, it "is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990); *In re T.L.L.*, 729 A.2d 334, 339 (D.C. 1999).  However, reasonable suspicion requires more than "a mere 'inchoate and unparticularized suspicion or hunch' of criminal activity," and officers must have "at least a minimal level of objective justification . . . ." *Maye v. United States*, 260 A.3d 638, 645 (D.C. 2021) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)).  An investigatory stop not supported by reasonable suspicion, regardless of how brief, is a violation of the rights guaranteed by the Fourth Amendment. *Golden v. United States*, 248 A.3d 925, 933 (D.C. 2021).

### A.    Seizure

We begin our analysis by determining the moment that Mr. Mitchell was seized.  *Pridgen*, 134 A.3d at 302 ("Our analysis of whether the officers had

reasonable articulable suspicion to seize appellant must begin with an identification of when precisely appellant was seized."). Under the Fourth Amendment, a person is seized by police when "police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). In such a context, a seizure occurs if the person being apprehended "'manifest[s] compliance with police orders' or requests." *Golden*, 248 A.3d at 935 (quoting *Plummer v. United States*, 983 A.2d 323, 331 (D.C. 2009)).

In the present case, we conclude that the trial court correctly found that police seized Mr. Mitchell "at least as early as the moment [he] submitted to the officers' show of authority by putting one hand in the air." The record and body worn camera footage illustrate a fast-moving scene from the moment that Officers Phillip and Pantaleon reached the top of the ramp to the Edgewood Apartments. There, they observed Mr. Mitchell accessing a call box near the apartment door at which point they activated their emergency lights. With the emergency lights activated, each officer exited the vehicle and yelled, "Let me see your hands" and quickly approached Mr. Mitchell. Officer Phillip had a hand on her firearm while doing so. Officers Phillip and Pantaleon's conduct constituted a show of authority sufficient for a seizure because any innocent, reasonable person in Mr. Mitchell's position

would believe that compliance with the officers' commands under those circumstances was required and not subject to being merely disregarded. *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) (explaining that the reasonable person standard, in the context of a seizure "does not vary with the state of mind of the particular individual being approached").

To complete a seizure by show of authority, Mr. Mitchell must have submitted to the officers' show of authority, and he did so. With the officers closing in on him and still straddling the bicycle, Mr. Mitchell turned partially and lifted his left hand toward the officers while his right hand remained on the bicycle. Though his compliance was imperfect, Mr. Mitchell's action in turning and raising his left hand toward the officers expressed submission to their authority all the while maintaining control of his bicycle with his right hand on the handlebar. *See United States v. Stover*, 808 F.3d 991, 996 (4th Cir. 2015) ("Determining what constitutes 'submission' can be a difficult, fact-intensive inquiry. 'What may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.'" (brackets omitted) (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007))). Accordingly, Mr. Mitchell was seized when he raised his hand toward the officers.

## B.      Reasonable Suspicion

Reasonable suspicion is determined by "the totality of the circumstances, as viewed through the eyes of a reasonable and cautious police officer on the scene, guided by [their] experience and training" and is determined based on the information that the officer had at the time of making the stop. *Posey*, 201 A.3d at 1201 (internal quotations omitted) (quoting *Henson v. United States*, 55 A.3d 859, 867 (D.C. 2012)); *Pridgen*, 134 A.3d at 301. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information" and "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 273, 277 (2002). However, "[r]easonable suspicion . . . must be particularized and objective as to the individual stopped." *Armstrong v. United States*, 164 A.3d 102, 108 (D.C. 2017). On review, this court considers each of the relevant factors purportedly constituting reasonable suspicion both "individually and collectively." *Maye v. United States*, 260 A.3d 638, 647 (D.C. 2021). "We appreciate, however, that some factors are more probative than others, and that if the observed behavior of a suspect is capable of too many innocent explanations, the logical gap between that behavior and the officer's suspicion signals that the intrusion was unreasonable." *Golden*, 248 A.3d at 941 (footnotes and internal quotations omitted).

Under this standard of review, we conclude that the officers lacked reasonable, articulable suspicion to stop Mr. Mitchell. The trial court summarized the principal factors justifying the stop as: (1) Mr. Mitchell was close in time and place to the ShotSpotter alert at a late hour; (2) Mr. Mitchell was the only person that the officers observed in the area as he was biking away at a fast pace from the general direction of the ShotSpotter; (3) Mr. Mitchell was dressed in all black clothing and wearing a ski mask; and (4) Mr. Mitchell flinched and increased his biking speed when he observed the officers exiting the alley in their patrol car.

We conclude that though Mr. Mitchell was observed a few blocks from the location of the ShotSpotter alert and was the only person the officers testified to seeing, the circumstances of this case are not such that the universe of potential suspects was sufficiently small so as to overcome the lack of information about a potential suspect. Further, the observations that the officers made of Mr. Mitchell concerning his appearance and actions as he was continuing along on his bicycle are not sufficiently suggestive of criminal activity and are capable of too many innocent explanations.

### 1. Mr. Mitchell's Temporal and Geographic Proximity to the ShotSpotter Alert

Taking each of the factors identified in turn, we begin our analysis with Mr. Mitchell's geographic and temporal proximity to the ShotSpotter alert. We acknowledge that the officers were responding to a possible discharged firearm as indicated by the ShotSpotter alert—a potentially dangerous and violent crime. Though the officers did not have any information about potential gunshot victims or harm attendant to the gunshot, they rightfully began their investigation of the possible crime with heightened awareness of potential danger.

Generally, courts have regarded ShotSpotter technology as a useful tool that aids police investigation in instances where a firearm has been discharged— especially in seeking to identify the location where the gunfire originated. *See Jones*, 1 F.4th at 54 (finding reasonable articulable suspicion to conduct a stop of the sole individual on a street where officers responded to the area identified by a ShotSpotter alert and neighbors called 911 to report gunshots). Contrary to what Mr. Mitchell asks us to conclude, we are of the view that information obtained through ShotSpotter technology may contribute to an officer's reasonable suspicion to conduct a stop. Nevertheless, despite its utility, we are not convinced that ShotSpotter technology alone is sufficient for a finding of reasonable articulable suspicion for anyone within the vicinity identified by the technology. *See United*

*States v. Rickmon*, 952 F.3d 876, 881 (7th Cir. 2020) (noting agreement with the proposition that "ShotSpotter, standing on its own, should not allow police officers to stop a vehicle in the immediate vicinity of a gunfire report without any individualized suspicion of that vehicle"). Rather, it should be considered as a factor in determining whether reasonable suspicion for a particular individual exists. *See United States v. Diaz*, No. 20-CR-176, 2020 WL 6083404, at *6 (S.D.N.Y Oct. 15, 2020) (finding reasonable suspicion where officers responded to ShotSpotter reports but emphasizing that the two "ShotSpotter reports [were] only two pieces of the [reasonable suspicion] calculus"). In the instant case, if reasonable articulable suspicion existed to stop Mr. Mitchell that evening on the basis that the ShotSpotter alerted nearby and Mr. Mitchell was present, it would be legally permissible to stop almost the entire universe of people who happened to be in the neighborhood. That cannot be so.

When considered in its totality, the ShotSpotter alert and Mr. Mitchell's proximity to it—both temporal and geographic—do not provide a great deal of probative information that suggests Mr. Mitchell committed a crime. It is undisputed that there were no 911 calls reporting gunshots in the area; there was no description of a potential suspect; and there was no information concerning the suspect's mode, direction, or rate of travel from the scene of the supposed gunshot. Further, a person on a bicycle such as Mr. Mitchell, if fleeing, would have a greater

potential range than the one or two blocks from the alert location, where he was found. Previously where this court has found reasonable suspicion despite the lack of a description of a suspect, we have done so because the attendant circumstances suggested that the "universe of potential suspects" was quite small. *Funderburk v. United States*, 260 A.3d 652, 657 (D.C. 2021) ("[W]e have recognized that sometimes the universe of potential suspects will be small enough that no description at all will be required to justify a stop[] for investigation." (internal quotations omitted)).

To illustrate, in *Funderburk*, we held that officers had reasonable suspicion to stop a suspect where officers responded to a ShotSpotter alert. 260 A.3d at 657-58. In that case, officers heard a commotion that sounded like an argument and several gunshots, responded within thirty seconds, and apprehended the suspect, who was the only person in the area. *Id.* We concluded that the resulting investigatory stop was supported by reasonable suspicion because of the immediacy of the officers' response, which "limit[ed] the possibility that the culprit (or culprits) could have fled." *Id.* Importantly, we observed that the officers responded to the scene thirty seconds after the crime occurred and was registered by the ShotSpotter technology. *Id.* We were further aided in the understanding of such a narrow universe of potential suspects by the location of the gunshot. *Id.* The officers responded to the gunshots in the alley of a residential neighborhood at 2:20 a.m. on a weekday in

December, which is a time and place where people are not expected to be going about their daily business. *Id.*

In the instant case, the temporal and geographic proximity were not nearly as close that we can say the "universe of potential suspects" is small enough to justify a stop of Mr. Mitchell without more. For temporal proximity, the trial court found that "a few minutes elapsed from when the ShotSpotter notification reached Officer Phillip's phone and when the officers first observed the defendant." Part of our finding of reasonable suspicion in *Funderburk* was the immediacy of the officers' response to the ShotSpotter alert—officers arrived to the scene within mere seconds of the crime occurring. Here, Officers Phillip and Pantaleon's first observation of Mr. Mitchell several minutes after the crime was reported in the ShotSpotter app does not exhibit the same immediacy that we found in *Funderburk*, which significantly reduces the likelihood that any suspects had the opportunity to flee.

Indeed, in *Posey v. United States*, we found that the officers' five- to ten-minute response time between the report of a crime and the stop was not sufficiently probative for the officers to "cast any particular suspicion on [the suspect]." 201 A.3d at 1203. Instead, within the time that the shot was initially registered by the ShotSpotter alert and the time Mr. Mitchell was observed, a suspect could have

easily fled the immediate area—especially if the suspect was on a bicycle as Mr. Mitchell was. Accordingly, the time that elapsed in the present case from the time of the alert to the time of the stop did not serve to narrow the potential range of suspects. *Armstrong*, 164 A.3d at 110 ("With regards to temporal proximity, particularized reasonable suspicion is usually found when the passage of time between the occurrence of a crime and a subsequent stop is immediate.").

The trial court also noted that the lateness of the hour when officers observed Mr. Mitchell contributed to its finding of reasonable suspicion. Officer Phillip testified that the area in which the shot registered was near a busy intersection, metro stop, and shopping center with several businesses and residences on a warm September night shortly before 11:00 p.m. In such an area and at a time where people can be expected to be coming and going, we are more hesitant to find reasonable suspicion in the absence of a description of a suspect. In contrast, in *Funderburk*, the gunshot that triggered the ShotSpotter alert occurred shortly before 2:20 a.m. in a residential neighborhood in the dead of winter when no one would be expected to be out. 260 A.3d at 654.

Accordingly, the facts of this case are not such that Mr. Mitchell's temporal and geographic proximity narrowed the universe of potential suspects. We do not

view these factors as helpful on their own or as adding much incriminating information to the totality of the circumstances.

### 2. Mr. Mitchell was the First and Only Person that the Officers Observed

Next, the trial court found it probative that Mr. Mitchell was the first and only person that the officers observed as they exited the mouth of the alley en route to canvass the area identified by the ShotSpotter. While being the sole individual in a potential crime scene has been a probative fact in other cases, here it is not, because of the time that passed since the commission of the crime and because the location where the officers actually observed Mr. Mitchell was not the block identified by the ShotSpotter.

First, as explained in the proceeding section, as police response time expands, so too does the relevant universe of potential suspects, making it less probative that the sole or first person that the officers observe is the culprit. *See In re T.L.L.*, 729 A.2d at 341 ("For purposes of determining whether the police suspicion is sufficiently particularized, the relevant universe 'will be determined primarily by the size of the area within which the offender might now be found (as indicated primarily by the amount of time which has passed since the offense) and the number of people about in that area.'" (internal quotation omitted)). This is even more true when the

observation occurs at a time and place where ordinary people in that location ought to be expected to go about their business, which is the case in this instance.

Officers Phillip and Pantaleon observed Mr. Mitchell on his bike a few blocks away from the location that the ShotSpotter indicated the shots originated. In *Jones*, the court held that officers had reasonable suspicion to stop a suspect following a ShotSpotter alert where the suspect was the only person on the block. 1 F.4th at 51. There, officers responded within a minute and a half of a ShotSpotter alert and observed the suspect as the sole person on the scene walking quickly away from the location. *Id.* Here, the officers arrived several minutes later, Mr. Mitchell did not appear to be evading the officers, and Mr. Mitchell was not at the location where the gunshots were fired. In holding that Mr. Mitchell's status as the first and only person that the officers observed is less probative here on its own, we do not minimize this factor in the totality of the circumstances approach. However, in light of the facts of the instant case, it is not significantly probative of Mr. Mitchell having committed a crime.

### 3. Mr. Mitchell's Appearance and Dress

The trial court indicated that Mr. Mitchell's dress contributed to reasonable suspicion. Mr. Mitchell was wearing a dark colored sweatshirt and a mask when officers encountered him biking past their patrol car. The officers later clarified that

the mask Mr. Mitchell was wearing was one that covered the perimeter of his face but did not obscure his facial features. We believe that regardless of whether it was the dark colored clothing or the fact that the article of clothing was a sweatshirt, neither was sufficient to cast suspicion on Mr. Mitchell. *See Golden*, 248 A.3d at 944 ("It would be more accurate to say, as courts in similar cases have done, that wearing a sweatshirt in warm weather is 'mundane' and 'typical of countless innocent people'—so common that it normally lends scant if any support to a suspicion that the wearer is armed or has criminal proclivities." (footnotes and internal quotations omitted)). Similarly, a mask covering just the perimeter of Mr. Mitchell's face coupled with testimony that it rained on the evening in question is less suggestive of criminal activity and more consistent with the practical needs of a person riding a bicycle in the rain. While officers are not required to rule out every innocent explanation for a suspect's behavior, we believe that Mr. Mitchell's attire could have too many innocent explanations such that it is untenable to assign suspiciousness to it that would justify a stop.

### 4. *Mr. Mitchell Flinching on the Bicycle and Increasing His Speed with the Officers Behind Him*

Finally, Officers Phillip and Pantaleon testified, and the trial court credited, that they developed reasonable suspicion of Mr. Mitchell because his behavior appeared evasive. Officer Phillip testified that as they exited the mouth of the alley,

they had to brake to avoid colliding with Mr. Mitchell on his bike. At that same time, Officer Pantaleon testified that Mr. Mitchell flinched when he first observed the officers. Additionally, Officer Panteleon testified that as they turned onto Fourth Street to follow Mr. Mitchell, he cut behind their vehicle to take the ramp up towards the Edgewood Apartments. Taken together, Mr. Mitchell's response in flinching appears to have been provoked by the sudden appearance or near collision with an automobile as a bicyclist. And his cutting behind the officers' vehicle to take a ramp toward the Edgewood Apartments where he lives is not as suspicious as the officers would have us believe—especially in light of the officers' realization shortly thereafter that Mr. Mitchell was going to those nearby apartments. It appears to us that any reasonable, innocent person on a bicycle in Mr. Mitchell's position would have also flinched after being startled by a vehicle exiting an alley that had to brake to avoid colliding with them.

Similarly, the officers testified that after allowing Mr. Mitchell to pass, they decided to follow him along the road. Both officers testified that as they followed him, Mr. Mitchell appeared to increase his speed and continued to look over his shoulder as he biked along the road. The government does not characterize Mr. Mitchell's conduct as fleeing from the officers as he was biking away from them. Additionally, Officer Pantaleon testified that, at that time, Mr. Mitchell was biking uphill toward the Edgewood Apartments, where police ultimately arrested

him.    These circumstances, again, are not suggestive of Mr. Mitchell having committed a crime.

Quite the opposite: most bikers would need to pedal harder, thereby increasing their speed, to bike up a hill.  Most bikers would try to keep a good lookout for traffic surrounding them, including by looking over their shoulder to monitor the traffic behind them, as Mr. Mitchell did here.   This court has emphasized that little probative value should be given to a suspect's nervousness when they encounter police officers.  *Golden*, 248 A.3d at 945.  Thus, even if we assume that Mr. Mitchell was not pedaling faster based on the necessity of biking uphill or looking over his shoulder to keep a good lookout, his apparent nervousness with officers trailing behind him is of little weight without additional objective observations that point toward criminal activity.   *Id.* (explaining that appellant's apparent "nervousness might have some corroborative value if . . . it was linked to some objective evidence that he was carrying a firearm").  And here, the officers had none.

*        *        *

None of the individual elements identified by the officers and the trial court on their own indicates that any criminal activity perpetrated by Mr. Mitchell was afoot.   Nor do these factors combine, in their totality, to point to reasonable

particularized suspicion that Mr. Mitchell had just engaged in criminal activity or preparing to immediately engage in criminal activity.

### IV.    Conclusion

For the foregoing reasons, we conclude that the police did not have the requisite reasonable suspicion to stop Mr. Mitchell.  We therefore reverse the judgment of the trial court, grant the motion to suppress, and vacate Mr. Mitchell's convictions for unlawful possession of a firearm (prior conviction), carrying a rifle or shotgun, possession of unregistered firearm, unlawful possession of ammunition, and wearing a hood or mask while engaged in unlawful conduct.[8]  The case is remanded for any further proceedings consistent with this opinion.

*So ordered.*

---

[8] While we have sincere doubt that the balaclava type of mask, covering Mr. Mitchell's head except for his face, would meet the definition of a mask for purposes of such a conviction, we need not reach it as an independent ground for vacating the conviction since our holding already necessitates the conviction be vacated.