Alex A. ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

No. 12–CF–1223.

District of Columbia Court of Appeals.

Submitted May 30, 2013.

Decided Sept. 26, 2013.

Susan E. Borecki, for appellant.

Kathryn L. Rakoczy, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Suzanne Grealy Curt, and Adrienne Moran, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, Associate Judges, and PRYOR, Senior Judge.

EASTERLY, Associate Judge:

Alex A. Robinson appeals his convictions for unlawful possession of a firearm and possession of an unregistered firearm. He argues that his Fourth Amendment rights were violated when he was seized and searched by police in the absence of the reasonable, articulable suspicion required under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to authorize a temporary detention and protective patdown. The Metropolitan Police Department ("MPD") officers who seized and searched Mr. Robinson were part of the Gun Recovery Unit in the Narcotics and Special Investigations Division. To accomplish their mission of recovering guns, they employed a simple technique: they asked any individual they encountered if he or she had a gun and then watched to see if that individual engaged in what the officers perceived to be suspicious behavior. In this case, Mr. Robinson, who had just discarded a half-drunk bottle of vodka and appeared to be intoxicated, did not respond to the "do you have a gun?" inquiry. Instead, the police observed him make "back and forth," "side to side" hand motions on his chest (he was wearing a winter coat, but he did not try to reach in any pockets or inside the coat). Based on these movements, the police grabbed, handcuffed, and searched Mr. Robinson; pursuant to this search, they found a small handgun in Mr. Robinson's coat pocket.

The hearing court acknowledged that it could not "imagine a more spare set of circumstances" to justify a *Terry* stop and protective patdown but concluded "if only just barely, that the actions of the officer here are consistent with the Fourth Amendment." We conclude otherwise. Although the reasonable, articulable suspicion threshold is low, it nonetheless requires an objective foundation both for the belief that an individual is engaged in criminal activity and, before a protective patdown is conducted, for the belief that the individual is armed and dangerous. We discern no such objective foundation here. Nothing about Mr. Robinson's silent hand motions or any other facts known to the police objectively signaled that Mr. Robinson was possibly engaged in the criminal activity of possessing a gun or posed a threat to the police because he might be armed. Because the police did not have reasonable, articulable suspicion to seize and search Mr. Robinson, the handgun they recovered must be suppressed. We further determine that Mr. Robinson's subsequent statements to the police must be suppressed as the illegal fruits of his unjustified seizure and search and thus we do not reach Mr. Robinson's additional argument that these statements must be suppressed on Fifth Amendment grounds.

## I. The *Terry* Stop and Protective Patdown

### A. Facts and Procedural History

After Mr. Robinson was charged with a number of gun-related offenses,[1] he moved

---

1. Mr. Robinson was charged with carrying a pistol without a license, D.C.Code § 22–

on Fourth Amendment grounds to suppress the handgun recovered from him in the course of a seizure and search by the police. The government took the position that the police had conducted a legitimate *Terry* stop and protective patdown. In support of that contention, the government presented testimony at the suppression hearing from the officer who confronted Mr. Robinson, MPD Officer Jordan Katz.

Officer Katz testified that, on the evening of November 30, 2011, he and three colleagues in the Gun Recovery Unit were driving in the area of 22nd Street in the Southeastern quadrant of the District. The four officers were in an unmarked car. Officer Katz was sitting in the back seat; he was in plain clothes but was wearing his tactical vest with the word, "Police," on the front and back. Officer Katz testified that their mission was "[e]ssentially what the title [of the unit] says, to recover guns." He described his job as being "about observations," specifically "how people react to [the Gun Recovery Unit]." In particular, "[w]hen [Officer Katz] ask[s] people if they have a gun, [he is] looking for a reaction—based on [their] movements after that question."

At approximately 8:30 p.m., the officers turned into "a parking lot slash alley" in the 3400 block of 22nd Street SE. Officer Katz said that they went to this location because it "is always one of our areas of focus" and that 22nd Street was "one of our top-yielding gun areas." [2] Once they were in the parking lot or alley, Officer Katz saw a parked car. The police pulled up alongside it. Officer Katz then shined his flashlight into the car and announced, "[i]t's the police."

The passenger side door of the car was already open, and Officer Katz first saw Mr. Robinson outside the vehicle on the passenger side. Mr. Robinson was holding up a bottle of vodka. The bottle "wasn't full." At the time, none of the officers had "any information from any source that Mr. Robinson had a gun on him."

Officer Katz observed Mr. Robinson take "a step back to the sidewalk" and then "start[ ] to shuffle" or "stumble" to his left. Officer Katz described the stumbling or shuffling motion as "goofy." Officer Katz testified that this "initial stumble made me think [Mr. Robinson] was drunk."

Officer Katz was the first officer out of the police vehicle. As he started to walk towards Mr. Robinson, he asked Mr. Robinson, "are you going to run[?]" and then reassured Mr. Robinson "I don't care about alcohol." At this point, Officer Katz testified Mr. Robinson was "still doing . . . a slow shuffle to the left . . . like a drunk person stumbling to his left." Mr. Robinson did not verbally respond to Officer Katz; but he did not run. Instead, he took the vodka bottle which he was holding in his right hand and "flung it . . . across his body to his left."

Officer Katz then asked Mr. Robinson "do you have a gun?" Officer Katz acknowledged that he had not seen "anything that would make me think that [Mr. Robinson] had a gun." When asked why he put this question to Mr. Robinson, Officer Katz explained, "I work for the gun

---

4504(a) (2001), unlawful possession of a firearm, D.C.Code § 22–4503(a)(1) (2012), and possession of an unregistered firearm, D.C.Code § 7–2502.01(a) (2001); he was also charged with possession of an open container of alcohol in a vehicle (POCA), D.C.Code § 25–1001(a)(2), (d) (2012).

**2.** When later asked by defense counsel if he could estimate the number of guns recovered from that location, Officer Katz testified that "[i]t's certainly over five."

recovery unit—he had alcohol—it's a common question that we ask anyway."[3] As before, Mr. Robinson did not answer. But Officer Katz observed that Mr. Robinson, who was wearing "a big, like a gray, winter coat ... a toggle coat," "brought both of his hands up to his chest," where he moved them "back and forth" or "side to side." Officer Katz testified that Mr. Robinson's hands remained "outside of his jacket" and he never saw Mr. Robinson try to reach into a pocket or inside his coat.[4]

Officer Katz testified that, because Mr. Robinson "was moving around his chest" and because "he didn't answer me," Officer Katz "didn't like what was happening." Officer Katz testified that, at this point, he developed the thought Mr. Robinson might have a gun. He testified that the only reason he had this thought was "the fact that [Mr. Robinson] put his hands up to his chest," and that this action took place "after the question of the gun."

Officer Katz "grabbed both of [Mr. Robinson's] wrists," and a fellow officer, Officer Jason Bagshaw, "went behind [Mr.] Robinson and bear hugged him from behind." Officer Katz then put his left hand on Mr. Robinson's chest, and he thought he "felt a firearm." Officer Katz signaled to a third colleague, Officer Thomas Sheehan, to look on Mr. Robinson's right side, but the police initially did not find a gun.[5] Only after the officers finished handcuffing him and redoubled their efforts did they find a "small" gun[6] "up on the right breast pocket on the outside of the coat." Officer Katz testified that, prior to the recovery of the gun, he "didn't even know [Mr. Robinson] had a pocket" in that location.

Although Officer Katz and his colleagues ostensibly searched Mr. Robinson for their own protection, the officers left the handgun where they found it, in Mr. Robinson's pocket. Officer Katz testified on cross-examination that he and his colleagues in the Gun Recovery Unit left weapons on suspects "all the time" and it was "standard procedure" for them.[7]

The hearing court made its factual findings before ruling on "the consequences of those findings." Crediting Officer Katz's testimony, the court found that, after Officer Katz asked Mr. Robinson if he had a gun, Mr. Robinson did not answer and "instead, brought both his hands up to his upper chest area and patted his upper chest area." The court found that Officer Katz did not have any "suspicion that Mr. Robinson had a weapon at any point before he saw those movements" and that Officer Katz had "asked Mr. Robinson whether he had a weapon, not because he had any suspicion that [Mr. Robinson] did,

---

3. Officer Katz testified similarly at trial that he asked Mr. Robinson if he had a gun "[b]ecause we were in the Gun Recovery Unit, so we ask everybody if they have a gun."

4. Officer Katz reiterated at trial that Mr. Robinson was moving his hands on the outside of his coat and did not try to reach inside his coat or into his pockets and that Mr. Robinson's hands remained on the outside of his coat "at all times." Officer Katz further specified that Mr. Robinson never reached below his chest area.

5. Officer Katz testified that Officer Sheehan found a knife on Mr. Robinson's right side.

At trial, Officer Sheehan described it as a "folding knife," and testified that he found it clipped to Mr. Robinson's belt. Mr. Robinson was not charged with any crime in connection with possession of this item.

6. The gun was a Bauer .25 caliber semiautomatic pistol.

7. On redirect, the government asked Officer Katz if he was "concerned that the defendant would be able to get to the gun," given that he was in handcuffs. Officer Katz responded that "[t]here is always that concern that people will try. ... [I]t could be that crazy chance that you can get your hands around front."

but because that's his job. He's a gun recoverer.... Apparently, he goes down the street asking everyone, do you have a gun."

In the course of making its findings, the hearing court rejected some of the government's characterizations of the evidence. For example, the government argued that Mr. Robinson had attempted to "evade [the] officers" when he "stumbled slash half runs" after the police made contact with him. But the court made no finding that Mr. Robinson tried to evade or flee from the police. Instead, the court found that, after throwing the half-drunk bottle of vodka on the ground, Mr. Robinson "then took some sideways steps that were a cross between stumbling drunkenly to the right or perhaps trying to move away from the officer to the right. Officer Katz said he wasn't able to figure out which of those it was."[8] Likewise, the government argued that Mr. Robinson had attempted to evade the police when Officer Katz "went to reach for [Mr. Robinson] and [Mr. Robinson] pushes [Officer Katz's] hands away." But the court found instead that, although "in the course of" detaining Mr. Robinson and performing the patdown the officer "was interrupted by Mr. Robinson pushing his hands away," this was "not an abnormal reaction when someone reaches towards you to swat their hands away."

Examining the facts actually supported by the record, the hearing court observed, "[t]his is a very close case. I can't imagine a more spare set of circumstances." Nevertheless, the court determined that "at the end of the day," "a reasonable ... suspicion has been articulated" because "[t]he officer was able to articulate what his suspicion was." The court grounded this determination in its assessment of Mr. Robinson's hand gestures. The hearing court opined that, had Mr. Robinson's movement been "something of the nature of putting his hands in his pocket, that's a normal action." But in the court's view, Mr. Robinson's hand movements "feeling" his chest were "not the kind of movement that someone makes ordinarily" and that this "coming immediately on the heels of being asked, do you have a gun, ... [wa]s enough" to satisfy the standard of reasonable, articulable suspicion. The court was "persuaded, that, if only just barely, that the actions of the officer here are consistent with the Fourth Amendment." The court later noted, "Mr. Robinson has a significant Fourth Amendment issue here. And I ruled against him on it, but it is a significant issue."

After Mr. Robinson's motions to suppress the gun and his subsequent state-

---

8. Even this finding—that Officer Katz was uncertain whether Mr. Robinson might have been trying to move away from Officer Katz—is not clearly supported by the record, however. Officer Katz initially testified that "the best way to characterize it [is] ... like a drunk person stumbling to his left." Elsewhere, Officer Katz testified that after throwing the vodka bottle, Mr. Robinson "didn't run. At best, he was characterized as standing, but he didn't run, no." Later when the court asked Officer Katz in the government's redirect whether "there [was] anything about the nature of [Mr. Robinson's] movements" that would allow him to answer the prosecutor's question as to whether Mr. Robinson was "stumbling because he could not stand up straight or was ... stumbling because he wanted to move from where he was," Officer Katz responded, "I'm not sure 100 percent how to answer that. I can picture how it went down in my mind." Officer Katz then gave a physical demonstration, which the court characterized as "stumbling to his right versus running to his right. Is that how you—" at which point Officer Katz interjected, "[y]eah. It's goofy." The government followed up by asking where Mr. Robinson went "[a]t the point that he stopped stumbling," and Officer Katz responded, "[h]e just stood there."

ments[9] about the gun were denied, he sought to plead guilty to the indictment and reserve his right to appeal, but the government refused to agree to a conditional plea. Thus, this case proceeded to a jury trial.[10] Both the trial court (Hon. Robert I. Richter) and Mr. Robinson's trial counsel noted that the government had expressed an interest in using the trial to augment the record about the police's seizure and search of Mr. Robinson and thereby to buttress the suppression ruling. But although Officer Katz and the three other officers involved in Mr. Robinson's stop and arrest all testified at trial, their description of what led to the seizure and search was not materially different from Officer Katz's testimony at the suppression hearing.

## B. Analysis

We review the hearing court's denial of Mr. Robinson's motions to suppress de novo. *Germany v. United States,* 984 A.2d 1217, 1221 (D.C.2009). In doing so, we review the hearing court's fact finding only for clear error and review the facts and all reasonable inferences therefrom in the light most favorable to the party prevailing before the hearing court, in this case the government. *Id.* Even so, it remains this court's obligation to " 'ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred.' " *Ramsey v. United States,* 73 A.3d 138, 142–43 (D.C.2013) (quoting *Thompson v. United States,* 745 A.2d 308, 312 (D.C.2000) (brackets omitted)). Here, the government argues that the police were authorized to grab, hand-cuff, and patdown Mr. Robinson under the Supreme Court's decision in *Terry,* 392 U.S. 1, 88 S.Ct. 1868.

As the Supreme Court observed in *Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), decided the same day as *Terry,* a "police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." Generally, in order to seize a person (and search them incident to that seizure[11]) without running afoul of the Fourth Amendment prohibition against unreasonable searches and seizures, the police must have probable cause to believe that an individual is committing or, in the case of a felony, has committed a crime. *Id.* at 62–63, 88 S.Ct. 1889. The Supreme Court's decision in *Terry* "created an exception to the requirement of probable cause, an exception whose 'narrow scope' th[e Supreme] Court"—and this court—have " 'been careful to maintain.' " *Ybarra v. Illinois,* 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (quoting *Dunaway v. New York,* 442 U.S. 200, 210, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)); *In re I.J.,* 906 A.2d 249, 259 (D.C.2006) (noting that *"Terry* is an exception to the Fourth Amendment probable cause requirement" (internal quotation and citation omitted)). Upon a lesser showing of "a reasonable suspicion supported by specific and articulable facts that the individual is involved in

---

9. Mr. Robinson filed one motion to suppress the gun and a separate motion to suppress his statements. We discuss these statements more fully in Section II of the opinion.

10. The trial court described the proceedings as a waste of "everyone's time," and expressed particular concern that counsel and the court were "wasting this jury's time in a way that is embarrassing."

11. *See United States v. Harris,* 629 A.2d 481, 492 (D.C.1993) (citing *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)).

criminal activity" a police officer may conduct a correspondingly less intrusive seizure: a brief "stop ... for investigatory purposes." *Henson v. United States*, 55 A.3d 859, 867 (D.C.2012) (internal citation and quotation marks omitted). And if, in the course of that stop, the officer "has reasonable, articulable suspicion that the person detained is armed and dangerous," "[a]n officer may also conduct a protective frisk for weapons." *Henson*, 55 A.3d at 867 (citing *Germany*, 984 A.2d at 1222); *see also Speight v. United States*, 671 A.2d 442, 449 (D.C.1996) (noting that "[t]he purpose of a *Terry* frisk is to ensure the safety of police officers"). " 'Nothing in *Terry* can be understood to allow a generalized cursory search for weapons,' " however. *Stanley v. United States*, 6 A.3d 270, 274 (D.C.2010) (quoting *Ybarra*, 444 U.S. at 93–94, 100 S.Ct. 338 (internal quotation marks omitted)); *see also Upshur v. United States*, 716 A.2d 981, 984 (D.C. 1998) ("The self-protective search authorized under *Terry* does not permit a generalized search for contraband.").

■ The "reasonable, articulable suspicion" standard "requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence." *Henson*, 55 A.3d at 867 (internal citation and quotation marks omitted). It is not "onerous," *id.*, but it is not toothless either.· Through its enforce-

ment, courts still have a meaningful role to play in ensuring that Fourth Amendment guarantees are not violated. *See Singleton v. United States*, 998 A.2d 295, 301 (D.C.2010) (noting that the two requirements for a *Terry* stop and frisk—that any suspicion be reasonable and articulable—are "not only the minimal safeguard of a person's constitutionally protected freedom to go about without coercion or seizure, but also are necessary for meaningful judicial evaluation of police action").[12]

■ "Unparticularized suspicion" and "inarticulate hunches" are not sufficient to sustain a *Terry* stop, *Terry*, 392 U.S. at 22, 27, 88 S.Ct. 1868; likewise, the subjective good faith of the police is irrelevant,[13] *id.* at 21–22, 88 S.Ct. 1868. Rather, courts look to the totality of the circumstances to see if "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." [14] *Id.* at 21–22, 88 S.Ct. 1868 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *see also Germany*, 984 A.2d at 1222 (The totality of the circumstances must reveal " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.' " (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868)). With respect to protective patdowns in particular, it is this court's

---

12. *See also Terry*, 392 U.S. at 21, 88 S.Ct. 1868 ("The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.").

13. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and

effects, only in the discretion of the police." *Terry*, 392 U.S. at 22, 88 S.Ct. 1868 (internal citation and quotation marks omitted).

14. It should go without saying that the fact that a gun is subsequently recovered does not validate a seizure and protective patdown under *Terry*. *See Powell v. United States*, 649 A.2d 1082, 1083 (D.C.1994) (noting that "this court has previously held that the end result can *never* justify the constitutionality of the circumstances leading to a seizure of evidence" (internal citation omitted)).

responsibility "to guard against the use of 'fear' as a sham for intrusion":

> Once a claim is made that an officer reacted out of a need to take protective action, the role of the courts is to ensure that the claim is objectively credible and reasonable when viewed through the officer's eyes and that it is not an afterthought to justify his actions.

*Johnson v. United States,* 350 A.2d 738, 740–41 (D.C.1976).

■ With this review of why and under what circumstances *Terry* stops and protective patdowns are constitutionally permissible, we turn to examine the facts in this case.

The government and the hearing court identified Mr. Robinson's hand motions as the key factor on which an assessment of reasonable, articulable suspicion should turn.[15] Thus we begin by analyzing these hand gestures which Officer Katz described as "back and forth" or "side to side" movements on the outside of Mr. Robinson's jacket in front of his chest area. There is nothing inherently suspicious or threatening about such movements. Officer Katz testified that Mr. Robinson was not making an effort to retrieve an item; similarly there was no testimony that Mr. Robinson was trying to conceal anything (nor was there any testimony that Mr. Robinson held any object or had any "bulge" on his person that required concealing[16]). And notwithstanding the government's characterization in its brief of these gestures as "furtive," there is nothing in the record regarding these motions to indicate that they were "expressive of stealth." *See* Webster's Third New International Dictionary, Unabridged (1981) (defining "furtive").[17] To the contrary, all the testimony at the hearing and at trial was that these gestures were open and obvious. *See United States v. Bellamy,* 619 A.2d 515, 521 (D.C.1993) (Defendant's gestures "were not even furtive" where "he did not act as if he were trying to hide anything from the officer's view, but instead directed his gesture towards the officer."). In short, nothing about these hand motions alone reasonably signaled to the police that Mr. Robinson might be armed.[18] *See Jackson v. United*

---

15. Officer Katz also indicated the hand movements were what gave him reasonable articulable suspicion. But we place no weight on his subjective reliance on these movements. *See Germany,* 984 A.2d at 1222, 1230 n. 18.

16. *See, e.g., Singleton,* 998 A.2d at 300–02. Not only did Officer Katz not see a bulge, he "didn't even know [Mr. Robinson] had a [chest] pocket," in his coat until the police found the gun.

17. We resist overly liberal application of this descriptor, as it may facilitate other serious policing problems. *See Floyd v. City of New York,* —— F.Supp.2d ——, ——, 2013 WL 4046209, at *6 (S.D.N.Y.2013) (observing that police officers in a class action challenging stop and frisk policies considered a broad range of activities, including "going in and out of a location" or "changing direction" to be furtive and concluding that "[i]f officers believe that the behavior described above constitutes furtive movement that justifies a stop, then it is no surprise that stops so rarely produce evidence of criminal activity").

18. We have previously concluded that an individual's ambiguous "stuffing motion with his right hand into the waistband area," *In re A.S.,* 827 A.2d 46, 47–48 (D.C.2003), or an individual's putting his hands in and out of his pockets, *see Duhart v. United States,* 589 A.2d 895, 895–96, 898–99 (D.C.1991), *Anderson v. United States,* 658 A.2d 1036, 1040 (D.C.1995), without more context, are not particularized facts which give rise to reasonable articulable suspicion. Even though "case matching is of limited utility in Fourth Amendment analysis of street encounters between citizens and police officers," *see Hampleton v. United States,* 10 A.3d 137, 144 n. 9 (D.C.2010) (internal citation and quotation marks omitted), we consider Mr. Robinson's ambiguous hand motions to be analogous to the motions in those cases.

*States*, 56 A.3d 1206, 1211 (D.C.2012) (noting the "importance of identifying a link between the nature of a particular gesture and a likelihood that the person making the gesture is armed"); *Bellamy*, 619 A.2d at 524 (noting that the hand "gesture was not so linked to gun possession as to lead to that inference").

We must consider, however, that Officer Katz viewed these "back and forth" "side to side" gestures after he asked Mr. Robinson if he had a gun. We note, as a preliminary matter, that Officer Katz did not ask Mr. Robinson if he had a gun because Officer Katz had even a hunch that Mr. Robinson was carrying a firearm. According to Officer Katz, he put this question to everyone he encountered out on patrol. As the hearing court found, "[a]pparently, he goes down the street asking everyone, do you have a gun." [19]

Even assuming Mr. Robinson's hand gestures were responsive to Officer Katz's question, they could not be reasonably perceived as an affirmative or inculpating nonverbal answer. Again, these were "back and forth" or "side to side" movements. Nothing about them signaled a physical admission; nothing about them suggested concealment of a guilty fact. The hearing court apparently considered these gestures odd and thus grounds for reasonable suspicion. But even if "[p]eople don't ordinarily walk around feeling their chest," this postulation did not fill the "logical gap" between Mr. Robinson's hand motions and the suspicion that he might be armed and dangerous. *See Jackson*, 56 A.3d at 1212.

Further, these ambiguous (if odd) gestures must be assessed in light of Officer Katz's prior observations of Mr. Robinson. Officer Katz believed, and the objective evidence indicates, that Mr. Robinson had been drinking and was impaired. Mr. Robinson was holding up a half-full bottle of vodka, appeared to be off-balance—he was stumbling or shuffling to his left—and was acting, in Officer Katz's words, "goofy." [20] In this context, it would be reasonable for a police officer to interpret Mr. Robinson's hand motions as the vague or uncontrolled gestures of an intoxicated individual. But a police officer would have to speculate to conclude that these hand motions indicated that Mr. Robinson was armed. *See In re A.S.*, 827 A.2d at 48 (noting that " 'if the behavior of a suspect is capable of too many innocent explanations, then the intrusion cannot be justified' " (quoting *Duhart*, 589 A.2d at 900)).

In addition to his hand gestures, we consider the fact that Mr. Robinson did not verbally respond to Officer Katz. Officer Katz testified: "And he didn't answer me. So I didn't like what was happening." But our "[r]ecognition that citizens have no legal duty to speak to the police would be rendered meaningless if the failure to cooperate were held to be a legitimate ground to conduct an investigatory stop." *Duhart*, 589 A.2d at 901; *see also Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (noting that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business" and that

19. Thus this case stands in contrast to other cases where the police stopped and frisked individuals after having received specific reports of criminal activity in the area. *See, e.g., Joseph v. United States*, 926 A.2d 1156, 1159, 1162 (D.C.2007) (reliable tip of a "man with a gun in the side of his waist" "easily afforded ... the necessary justification to conduct an investigatory stop and frisk" under totality of the circumstances (internal quotation marks omitted)).

20. Officer Kirk Delpo, who interviewed Mr. Robinson within an hour and a half of his arrest also testified that he thought Mr. Robinson was drunk during the interview.

"refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." (internal citations and quotation marks omitted)). And here, there appears to have been an obvious reason for Mr. Robinson's failure to respond—his apparent intoxication. From the moment Officer Katz first saw him holding up a bottle of vodka, Mr. Robinson had been wordless; he had not spoken to Officer Katz when Officer Katz announced "police" or when Officer Katz initially asked Mr. Robinson if he was going to run.

Examining these facts, we have some concern that Officer Katz's mission may have clouded his perception of what he saw. Officer Katz and his team were out looking for guns. To that end, Officer Katz asked everyone if they had a gun, and he looked for a "reaction—based on movements" after that question, and then he evaluated the physical response to that question to determine whether to investigate further. As noted in the recent stop and frisk civil litigation in New York City, "[r]ecent psychological research has ... provided evidence that officers may be more likely to perceive a movement as indicative of criminality if the officer has been primed to look for signs that 'crime is afoot.'" *Floyd*, —— F.Supp.2d at ——; *see also id.* ("'[G]iven the nature of their work on patrol, officers may have a systematic tendency to see and report furtive movements where none *objectively* exist.'" (quoting *Ligon v. City of New York*, 925 F.Supp.2d 478, 530 (S.D.N.Y.2013))).

That Officer Katz's mission may have made him overly ready and willing to seize and search Mr. Robinson is further supported by the fact that he and his colleagues did not act in a manner consistent with a concern for their safety. *See Powell*, 649 A.2d at 1088 (stop and frisk unconstitutional where officers' expressed "fear for their safety [wa]s belied by the record testimony and by their own actions"); *see also Tyler v. United States*, 302 A.2d 748, 752 (D.C.1973) (suppression warranted where "the search [did not] appear to be reasonably related to the protection of the officers"). Even though the whole point of *Terry* patdowns is to remove weapons from the possession of suspects, *see Terry*, 392 U.S. at 24, 88 S.Ct. 1868 (authorizing protective patdowns so that police have "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm"), the officers did not take the gun away from Mr. Robinson.[21] Officer Katz testified at trial that the reason the police "did that [was] because [they] wanted to basically have the gun where [they] found it to call the crime scene people to come take a photograph" because "[i]t always helps to have a picture."

The fact that the police left the gun in Mr. Robinson's pocket to create better evidence against him in any criminal prosecution buttresses the conclusion that they did not have an objective (or subjective) basis to feel concern for their safety before the protective patdown. Rather, the officers' response to the discovery of the gun and decision to leave it in Mr. Robinson's possession suggests that they were misusing *Terry* to conduct an investigative search for contraband on less than probable cause and without a warrant.

Indeed, Officer Katz testified that he and his colleagues went to the area

---

**21.** Handcuffing Mr. Robinson did not fully address safety concerns, as Officer Katz acknowledged. See *supra* note 7; *see also Germany*, 984 A.2d at 1229 (observing that handcuffs "provide no guarantee that a restrained individual cannot reach places where contraband is secreted and endanger police").

where they seized and searched Mr. Robinson because it was one of the Gun Recovery Unit's "top-yielding gun areas." The fact that this was a "high crime neighborhood" is the only other factor we can discern on this record that is relevant to an assessment of reasonable articulable suspicion.[22] It is "among the relevant contextual considerations in a *Terry* analysis," to be sure. *See Jackson,* 56 A.3d at 1214 (quoting *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673). But "reliance on the character of the streets and what has been happening recently is not the same as the particularized, individualized suspicion that is required under *Terry.*" *Bellamy,* 619 A.2d at 522.[23] Certainly it does not authorize officers to rove troubled neighborhoods and briefly detain and patdown anyone they encounter. Here, Officer Katz admitted he and his colleagues had no particularized information that Mr. Robinson might be carrying a gun when they entered the area, and Officer Katz developed no such thought until after he asked if Mr. Robinson had a gun and he observed Mr. Robinson engage in conduct which, as we have explained, did not give rise to reasonable, articulable suspicion that Mr. Robinson was armed and dangerous. *See Duhart,* 589 A.2d at 899 ("[T]here are limits to the inference that an experienced reasonable police officer can rationally draw" to justify a *Terry* stop and frisk.).

As the Supreme Court noted in *Terry,* "even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry,* 392 U.S. at 24–25, 88 S.Ct. 1868. It falls to courts to ensure that even these brief stops and limited protective searches are not executed with inadequate justification. We conclude that this is one such case. Where Mr. Robinson appeared to be intoxicated and the officers had no reason to suspect him of wrongdoing before their interaction, his back-and-forth, side-to-side hand motions, made after he was confronted by four police officers and asked if he had a gun, coupled with his silence and his presence in a high crime area did not give rise to an objective, particularized suspicion that Mr. Robinson was armed and dangerous. Ac-

---

**22.** The government has not renewed its unsupported and unsuccessful argument at the hearing that Mr. Robinson was trying to evade or flee from the police. See *supra* note 8 and accompanying text. The government does argue on appeal that, in assessing whether Officer Katz had reasonable articulable suspicion to seize and search Mr. Robinson, this court must consider that this was a nighttime encounter and that Mr. Robinson appeared nervous. This encounter took place at approximately 8:30 p.m., "not an unusual hour for citizens of this city to be walking in the streets." See *Curtis v. United States,* 349 A.2d 469, 471–72 (D.C.1975) (making this observation about 7:20 p.m.). In any case, "the lateness of the hour at which the stop occurred" is merely a background consideration. *Jackson,* 56 A.3d at 1214; *see also Bellamy,* 619 A.2d at 522 (noting that "[t]he 'late hour' was only 11:30 p.m." and that the proper focus is the officer's potential vulnera-

bility). Turning to Mr. Robinson's demeanor, Officer Katz never described Mr. Robinson as "nervous" during the suppression hearing, that portrayal is not borne out by anyone's documented observations, and, unsurprisingly in light of the lack of record support, the hearing court never made any finding that Mr. Robinson was nervous.

**23.** *See also Ramsey,* 73 A.3d at 143 (noting that "[b]y itself, appellant's presence in the alley—'an area of expected criminal activity'—was 'not enough to support a reasonable, particularized suspicion that [appellant was] committing a crime'" (quoting *Henson,* 55 A.3d at 867)); *Duhart,* 589 A.2d at 900 ("[T]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct." (internal citation and quotation marks omitted)).

cordingly, we hold that the gun recovered from Mr. Robinson should have been suppressed.[24]

## II. Mr. Robinson's Statements After the *Terry* Patdown

■ Mr. Robinson seeks not only the suppression of the handgun recovered by the police but also the suppression of the inculpatory statements he made, all within an hour and a half of the seizure and search and all to the effect that the gun was not loaded. Mr. Robinson argues that these statements must be suppressed as fruits of the impermissible *Terry* patdown.

Mr. Robinson's first set of statements was made immediately after the police grabbed and handcuffed him and discovered the gun. Officer Katz testified at the suppression hearing that, at the time the gun was found, "[Mr. Robinson] said it wasn't loaded." At the same time, Mr. Robinson began to "collapse," which prompted another officer on the scene, Officer Leo, to caution Mr. Robinson "something to the effect of, cut it out. Or, you have a gun in your pocket." In response, Mr. Robinson "commented again" and told the police, "it's not even loaded."[25]

Mr. Robinson's additional statement was made that same evening at the Seventh District Stationhouse, less than an hour and a half after the illegal seizure and search. Mr. Robinson had been taken to the stationhouse to be interviewed—because that was the protocol for all individuals arrested by the Gun Recovery Unit. The interview, conducted by Officer Delpo,

---

**24.** The government has not argued on appeal that the search of Mr. Robinson was permissible under the Fourth Amendment as a search incident to an arrest for a POCA (the only mention the government makes of a such a theory is to acknowledge that this was discussed, on the trial court's initiative, at the suppression hearing, but that the government had not raised this argument in its written opposition to the motion to suppress).

The government, however, makes a new argument in a footnote in its brief that the seizure and search of Mr. Robinson need not be justified under *Terry* at all because it could have been a legitimate search incident to an arrest for assault on a police officer (APO) based on actions Mr. Robinson made in the course of what otherwise would have been an illegal stop and frisk. We have never held that such a search may be conducted where the police do not actually arrest the suspect for the charged crime that purportedly justifies the search. Moreover, this uncharged-APO/search-incident-to-arrest rationale for Mr. Robinson's seizure and search would at the very least be in tension with the rule, (acknowledged by the government) that a search incident to arrest may precede the actual arrest only "if probable cause exists, *independent of the search*, to justify the arrest, and if the arrest follows 'quickly on the heels' of the search." *Millet v. United States*, 977

A.2d 932, 935 (D.C.2009) (internal quotations and citation omitted); *see also Sibron*, 392 U.S. at 63, 88 S.Ct. 1889 ("It is axiomatic that an incident search may not precede an arrest and serve as part of its justification").

We decline to reach these issues, however, because the government forfeited its opportunity to defend its seizure and search of Mr. Robinson based on this new theory. The burden was on the government to justify the seizure and search of Mr. Robinson, *see Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011), and it had a "full and fair opportunity" to argue at the suppression hearing that his seizure and search was not an unjustified *Terry* stop at all but rather a search incident to a possible arrest for APO. *See Cave v. United States*, 75 A.3d 145, 148 (D.C.2013) (Newman, J., concurring). It did not make this argument, and we will not entertain it for the first time on appeal. *Bennett*, 26 A.3d at 757 n. 13 (summarily rejecting an argument to justify the seizure of the defendant where the government never made that argument to the trial court).

**25.** Officer Leo testified at trial that Mr. Robinson's admissions ("[m]an, that's—that's my gun. There's no bullets in it") were made in response to his warning to Mr. Robinson that "you have a firearm in your pocket and I don't want that thing to—go off."

was videotaped. Less than five minutes after it began, Mr. Robinson asked Officer Delpo if he could get a lawyer and then stated "I'd like one." Although Officer Delpo stated "so, we'll just, we'll just end it right here," the interview continued with Officer Delpo reciting the charges against Mr. Robinson. When Mr. Robinson subsequently objected that "I haven't gotten like my Mirandas or nothing," Officer Delpo responded that that was "[be]cause you want to skip past what your rights are."[26] Officer Delpo then read all of the charges Mr. Robinson was facing as a result of the recovery of the gun and Mr. Robinson again noted that he had no lawyer. More than five minutes after his first request for counsel, Mr. Robinson said that the "gun ain't had no goddamn bullets in it. No bullets like since I had it." Officer Delpo escorted Mr. Robinson from the room moments later.

 "Evidence which has been obtained by the police through unlawful means generally must be suppressed as 'fruit of the poisonous tree.' This rule applies to both physical evidence and testimonial evidence." *Oliver v. United States,* 656 A.2d 1159, 1172 (D.C.1995) (citing *Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Here, Mr. Robinson's statements flowed from his illegal seizure and search. Because Mr. Robinson's statements were a product of a Fourth Amendment violation, they must be suppressed.[27]

For the reasons set forth above, we hold that Mr. Robinson's motions to suppress the gun and statements obtained by the police as the result of an illegal seizure and search should have been granted. We remand for further proceedings.

*Reversed and remanded.*

26. Officer Delpo seemed to believe that he could continue the interview "[be]cause [Mr. Robinson] want[ed] to skip past" what his rights were. But, at that point, Mr. Robinson had already invoked his right to a lawyer, and the attachment of his Fifth Amendment rights was not contingent on Officer Delpo advising Mr. Robinson of their existence.

27. When a motion to suppress evidence or statements is made on Fourth Amendment grounds, the government may argue that " 'an intervening event or other attenuating circumstance purge[d] the taint of the initial illegality,' " so as to obviate suppression. *Oliver,* 656 A.2d at 1172 (brackets omitted) (quoting *United States v. Wood,* 981 F.2d 536, 541 (D.C.Cir.1992) (internal quotation marks omitted)); *see e.g., United States v. McMillian,* 898 A.2d 922, 940–41 (D.C.2006). But just as the government bears the burden to demonstrate that it did not violate a defendant's Fourth or Fifth Amendment rights, it is the government's burden to prove attenuation. *Oliver,* 656 A.2d at 1172. In this case, Mr. Robinson argued before the hearing court that his statements should be suppressed both as fruits of the illegal search and as the product of a *Miranda* violation, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but the government only responded to the *Miranda* argument. On appeal, the government appears to concede that this case rises or falls on the constitutionality of the government's seizure and search, asserting that "because a reasonable, articulable suspicion supported the stop-and-frisk of appellant, the evidence *and statements* that resulted from this encounter should not have been suppressed."